IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 22, 2003

**STATE OF TENNESSEE v. TIM HOLT**

**Appeal from the Criminal Court for Hancock County**
**No. 2322     James E. Beckner, Judge**

---

**No. E2002-02471-CCA-R3-CD**
**November 17, 2003**

---

The defendant, Tim Holt, appeals as of right from his conviction by a jury in the Hancock County Criminal Court for first degree, premeditated murder.  The defendant received a sentence of life imprisonment with the possibility of parole.  He contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erroneously allowed the defendant's wife to testify, violating his privilege regarding marital communications, (3) the trial court erroneously allowed prejudicial exhibits to be entered into evidence, and (4) the trial court erroneously instructed the jury on second degree murder.  We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA McGEE OGLE, J., joined.

Greg W. Eichelman, District Public Defender, for the appellant, Tim Holt.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Jonathan M. Holcomb and Connie Trobaugh, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's killing William Marshall Haas on August 21, 2001.  At trial, Jane Turnmire testified that on that date, she saw a car off the road as she drove on Highway 131.  She said that when she approached the car, she saw a man inside who was bleeding and struggling to breathe.  She said that his pulse was weak and that he quit breathing about two minutes after she arrived.  On cross-examination, she said that there was a truck driver at the roadside when she arrived but that he did not approach the victim's car.  She said that blood was on the steering wheel, the floorboard, and the dash but that she did not see much blood on the passenger side of the vehicle.  She said she did not see the defendant while she was at the victim's car.

Scotty Ferguson, a special agent for the Tennessee Bureau of Investigation, testified that when he arrived at Highway 131, he saw the victim inside a blue Subaru Brat parked about one-hundred thirty-five feet north of the highway. He said he saw a gunshot wound near the left eye of the victim and a bullet hole behind the door of the victim's car. He said that he had no suspects at that time but that he arrested the defendant later based on information he received from the defendant's wife and daughter.

Ferguson testified that the defendant agreed to make a statement and that in the statement, the defendant said he drove up from behind the victim, shot him, and then drove away from the victim. He said that he did this to protect his family and that people had been prowling around his yard at night. He said that he called the police but that they would not help him. He said that he saw the victim drive by his house every day and that he believed the victim may have killed others. The defendant said God wanted him to kill the victim to protect his family.

Randy Surgenor testified that he was driving his logging truck around a corner when he saw two cars driving beside each other. He said both he and the other two cars were traveling west on Highway 131. He said he saw one car veer off the road even though the two cars never collided. He said the other car was a light-colored car and continued west on the highway after the first car veered off the road. He said he called 9-1-1 at that time. On cross-examination, he said he never heard a "pop" or a "blast" and did not see a weapon in the car that continued on the highway. He acknowledged that although he stopped, he never approached the car that had veered off the road.

Dolly Faye Holt, the defendant's wife, testified that the defendant began using methamphetamine in early 2000. She said that in August 2000, the defendant began to think the police were watching them and believed the victim was an undercover agent who was trying to catch them using drugs. She said she tried to convince the defendant that the victim was just passing their house to deliver newspapers. She said that on August 21, 2001, she was returning from work around eight o'clock in the morning when the defendant told her that people were watching them and trying to tear their family apart. She said that the defendant left around eleven that morning, taking a shotgun with him. She said that later that evening she heard that the victim had been shot and asked the defendant if he was involved. She said he did not say anything at first but later admitted to her and her daughter that he shot the victim. She stated he said he shot the victim because the victim was trying to tear the family apart. She said the defendant asked her not to tell anyone that he shot the victim. She said that later, while he was in jail, he told her that he had help in the shooting.

On cross-examination, she said that the defendant believed several items in their house were "bugged" and that people were prowling around their yard at night. She said the defendant shot at their outbuilding once because he believed he heard people on their property. She said he also claimed someone had taken their outbuilding apart and then nailed it back together. She said that she never saw or heard anyone on their property and that she tried to convince the defendant that there were no "bugs" in their house. She said she heard Mike Mathis, an acquaintance of the defendant, tell the defendant in reference to the victim that if the victim was watching his family, he

would kill him. She said she also heard Mathis tell the defendant that the victim was using the newspaper route as a cover.

Russell Davis, a special agent for the Tennessee Bureau of Investigation, testified that a gunshot hole was in the victim's car's door and that gunshot residue was on the victim, indicating the victim was shot at close range. Terri Arney, also a special agent for the Tennessee Bureau of Investigation, testified that the defendant's shotgun was functional. Dr. Ellen Wallen, a forensic pathologist, testified that the victim died of a gunshot to the face and that the victim was looking to his left when he was shot.

Dr. Eric Engum, a clinical neuropsychologist, testified that he met with and performed tests on the defendant for fifteen hours in February 2002. He said that although he found no brain damage, he concluded that the defendant was mildly mentally retarded. He said that based on the defendant's test results, he also diagnosed the defendant as being paranoid. He said, however, that the defendant was competent to stand trial, that he understood his Miranda rights, and that he was not insane at the time of the murder. On cross-examination, he said the defendant's drug abuse may have been a causal factor in the defendant's paranoia. He said the defendant understood the difference between right and wrong. He said the defendant lied to him about the killing, which indicated that the defendant was capable of premeditation.

The defendant testified he was thirty-six years old, married, had a second grade education, and could not read or write. He said he did not believe he had mental problems but admitted abusing drugs in August 2001. He said that at that time, people were prowling around his property and that he noticed things were out of place. He said he shot at the outbuilding and yelled at whomever was on his property to keep them away from his wife and child. He said he knew his home was "bugged." He said that someone was watching him during August 2001 but that he did not know who it was. He said that he first thought that it was people using drugs who were watching him but that he later believed it was the police.

The defendant testified that he did not know that the victim was a constable until after he shot him. He said Mathis convinced him that the victim was an undercover agent who was trying to catch him using drugs. He said he was not on drugs the day he shot the victim. He said he followed the victim for three miles, pulled beside the victim's vehicle, and shot him. He said that when he shot the victim, he was only trying to scare him and that he was aiming for the bed of the victim's truck. He said that after the shooting, he threw the shells and the casings from the gun out the window and went to Mathis' house but did not tell him about the shooting. He said that when he arrived home, he mowed his yard. On cross-examination, he said that his statement to police was incorrect because he never told the police that God told him to shoot the victim. He said he told the police that God told him to protect his family. Based upon this testimony, the jury convicted the defendant of first degree, premeditated murder.

# I. SUFFICIENCY OF THE EVIDENCE

On appeal, the defendant contends that the evidence is insufficient to show premeditation on his part. The defendant claims that he was only trying to scare the victim and that his mental impairment negated his ability to act with premeditation. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree premeditated murder is defined as an unlawful, "premeditated and intentional killing of another." T.C.A. §§ 39-13-201, -202(a)(1). Premeditation is defined as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

Viewed in the light most favorable to the state, the evidence shows that the defendant believed that the victim was an undercover agent who was trying to tear his family apart. On August 21, 2001, the defendant waited with a gun for the victim to drive past his house and then followed him for three miles. He pulled beside the victim, who was unarmed, and shot him intentionally in the face at close range. After the shooting, he did not stop to check on the victim, he threw the shells and casings out of his window while driving away, and he began mowing his yard when he arrived home. After first not telling his wife that he shot the victim, he later told her that he did shoot the victim and asked her not to tell anyone about the shooting. The defendant claims he was only trying

to scare the victim, but the jury chose to believe the witnesses who supported the state's theory of the case: that the defendant waited for the victim, followed him, and shot him, intending to kill the victim. The evidence is sufficient to support the defendant's conviction for premeditated murder.

## II. MARITAL PRIVILEGE

The defendant contends that his statements to his wife regarding the killing were privileged and that the trial court erred by allowing her testimony. Relative to the marital communications privilege, T.C.A. § 24-1-201(c)(1)(A)-(D) (2000) states that in a criminal proceeding, a marital communication is privileged if:

> (A) The communications originated in a confidence that they will not be disclosed;
> (B) The element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties;
> (C) The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and
> (D) The injury to the relation by disclosure of the communications outweighs the benefit gained for the correct disposal of litigation.

If the trial court finds the communication to be privileged, it is inadmissible upon objection of either spouse. Id. § 24-1-201(c)(2) (2000). The trial court found that none of the factors applied and allowed testimony regarding the defendant's statements to his wife about the killing.

The record supports the trial court's finding with regard to factor (A) that the defendant's statements to his wife were not made in confidence. See T.C.A. § 24-1-201(c)(1)(A) (2000). Both the defendant and the defendant's wife testified that the defendant told their fifteen-year-old daughter that he killed the victim at the same time he told his wife. The marital privilege does not extend to communications made to or in the presence of third parties. State v. Price, 46 S.W.3d 785, 800 (Tenn. Crim. App. 2000).

The record supports the trial court's conclusion with regard to factors (B), (C), and (D). His wife's testimony regarding the defendant's communications about the killing did not affect her relationship with the defendant adversely because the evidence shows that their marriage was already deteriorating. At the time of the defendant's arrest, his wife was no longer living with him and had sought an order of protection against him. The record supports the trial court's conclusion that the relationship should not be sedulously fostered and that injury to it did not outweigh the benefit gained from proving that the defendant intentionally murdered the victim. We conclude that the trial court properly admitted the wife's testimony into evidence.

## III. ADMISSIBILITY OF EXHIBITS

The defendant contends that seven exhibits should not have been allowed into evidence and that their admission by the trial court prejudiced the defendant. These exhibits consist of broken parts of the victim's glasses, two bags containing pellets recovered in or near the victim's car, a picture of miscellaneous items recovered from the victim, and a picture of the victim after being shot.

Initially, we note that the state claims that the defendant has waived the issue of admissibility because the defendant failed to make a contemporaneous objection at trial pursuant to Rule 103(a)(1), Tenn. R. Evid., and has not cited to specific authority for his objections in his brief. See State v. Jody Sweat, No. E2000-02472-CCA-R3-CD, Sevier County, slip op. at 11 (Tenn. Crim. App. Sept. 26, 2001) (holding that the failure of the defense to make a contemporaneous objection at the time the state submits exhibits results in a waiver of the issue). At a pretrial conference, however, the defendant objected to the trial court's admitting the seven exhibits because they would be inflammatory. The trial court ruled on what evidence would be admissible to show that the defendant intended to shoot the victim. We conclude that even if a defendant does not contemporaneously object to the admission of evidence at trial, the issue is not waived if the trial court was apprised pretrial of the defendant's objection and made definitive rulings at that time based upon the objection. See Goines v. State, 572 S.W.2d 644, 649 (Tenn. 1978). As in Goines, it would be manifestly unjust for us to apply the waiver rule for the defendant's failure to object at trial under the circumstances of this case. See id. As for the defendant's brief, he does not cite any authority specifically as he is required to do. See T.R.A.P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). It is easy to conclude, though, that he relies upon Rule 403, Tenn. R. Evid.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence showing that the defendant intended to shoot the victim and not the bed of the victim's truck is relevant to show the defendant's intent. The broken pair of glasses, the picture of the victim showing the impact of the shooting, and the volume of pellets found help support the prosecution's theory that the killing was not an accident by showing the close range from which the shots were fired. The picture of miscellaneous items found on the victim, including a badge, handcuffs, and money is of questionable relevance but it is not prejudicial and the defendant does not explain why we should hold that it prejudiced him.

Rule 403, Tenn. R. Evid., states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues . . . ." The defendant never asserts how the evidence he challenges is prejudicial. Instead, the defendant lists the seven exhibits and states summarily that they are prejudicial without explaining why they prevented him from receiving a fair trial. We conclude that any possible prejudice could not substantially outweigh the probative value of the state showing that the defendant shot the victim at very close range, indicating an intent to kill the victim.

## IV. JURY INSTRUCTIONS

The defendant contends that the trial court erroneously instructed the jury on the definition of "knowing" when it charged the jury on second degree murder. The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. The trial court must describe each element of an offense and define the element in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). A charge is prejudicial error if it fails to "submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990).

In State v. Page, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002), this court noted that second degree murder is a result-of-conduct offense and held that a trial court errs if it includes the nature-of-conduct or nature-of-circumstances definitions of "knowingly" in its charge to the jury. In this case, the defendant's mental state is contested because he contends that he never intended to kill the victim and that the killing was not a "knowing" one. The defendant claims that the trial court's "knowing" instruction is improper under Page, but does not explain how the jury instruction is improper under Page. The trial court's jury charge with regard to second degree murder states:

> Any person who commits second degree murder is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant unlawfully killed the alleged victim; and
> (2) that the defendant acted knowingly.
>
> "Knowingly" means that a person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.
>
> The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.
>
> The term "intentionally" has already been defined.

This jury charge properly instructs the jury that the defendant must be aware that his conduct is reasonably certain to have the requisite result for the defendant to be found to have a "knowing" mens rea.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.


_____
JOSEPH M. TIPTON, JUDGE